**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § §  §  §  §  §  §  §  §  §  §  §  §  §  §  §  §  § | **COMPLAINT FOR FORFEITURE** *IN REM* |
| **v.** | | |
| **APPROXIMATELY 2,389,778.77 USDT;** | | *CIVIL ACTION NO.* **26-cv-2539** |
| **Defendants,** *in rem.* | | |

**VERIFIED COMPLAINT FOR FORFEITURE *IN REM***

Plaintiff, the United States of America, through the U.S. Attorney for the District of Columbia, brings this verified complaint for forfeiture in a civil action *in rem* against approximately 2,389,778.77 USDT, hereinafter referred to as "Defendant Property," and alleges as follows:

**STATEMENT OF THE CASE**

1.      Criminals believed to be located abroad, their associates, and conspirators together stole funds from one or more victims. The funds were then laundered through a series of virtual currency addresses to evade detection and hide the origin of the funds. The United States Department of Homeland Security, United States Secret Service ("USSS"), investigated, traced, and seized the Defendant Property, which constitutes proceeds traceable to those thefts and property involved in, and traceable to, this money laundering scheme.

2.      The United States of America seeks to lawfully forfeit the Defendant Property to punish and deter criminal activity by depriving criminals of property used in or acquired through illegal activities, and most importantly, to recover assets that may be used to compensate victims.[1]

## JURISDICTION AND VENUE

3.      This Court has original jurisdiction of this civil action by virtue of 28 U.S.C. § 1345 because it has been commenced by the United States and by virtue of 28 U.S.C. § 1355(a) because it is an action for the recovery and enforcement of a forfeiture under an Act of Congress.

4.      This Court has subject matter jurisdiction over the Defendant Property under 28 U.S.C. § 1345, because the United States is the plaintiff, and 28 U.S.C. § 1355(a), because this is an *in rem* forfeiture proceeding.

5.      Venue is proper in this judicial district under 28 U.S.C. §§ 1355(b)(1)(B), 1355(b)(2), and 1395(a) because the property is subject to forfeiture under the laws of the United States and is controlled by Tether International S.A. de C.V. ("Tether"), which is domiciled in the country of El Salvador.

## NATURE OF THE ACTION AND STATURY BASIS FOR FORFEITURE

6.      The United States files this *in rem* forfeiture action to seek forfeiture of Defendant Property as constituting proceeds of wire fraud and wire fraud conspiracy offenses, committed in violation of 18 U.S.C. §§ 1343, 1349, 2, and 3, and as involved in money laundering and money laundering offenses, committed in violation of 18 U.S.C. 1956(a)(1)(B)(i), 1956(a)(2)(B)(i), 1956(h), and 2, and 3.

7.      Procedures for this action are mandated by Rule G of the supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions and, to the extent applicable,

---

[1] *See* United States Asset Forfeiture Program, *Our Mission*, https://www.justice.gov/afp.

18 U.S.C. §§ 981 and 983 and the Federal Rules of Civil Procedure.

8.    18 U.S.C. § 981(a)(1)(A) mandates forfeiture of any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956, 1957 or 1960, or any property traceable to such property.

9.    18 U.S.C. § 981(a)(1)(C) mandates forfeiture of property constituting or derived from proceeds traceable to any offense, or a conspiracy to commit an offense, constituting "specified unlawful activity" as defined by 18 U.S.C. § 1956(c)(7). A violation of 18 U.S.C. § 1343, or a conspiracy to commit that offense, constitutes specified unlawful activity under 18 U.S.C. § 1956(c)(7)(A), by way of 18 U.S.C. § 1961(1)(B).

10.    18 U.S.C. § 1343 provides in relevant part that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice," commits the violation of wire fraud.

11.    18 U.S.C. § 1349 provides in relevant part that whoever "attempts or conspires to commit [a violation of 18 U.S.C. § 1343] shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

12.    18 U.S.C. § 1956(a)(1)(B)(i) provides in relevant part that "[w]hoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or

3

the control of the proceeds of specified unlawful activity" is guilty of concealment of money laundering.

13.    18 U.S.C. § 1956(a)(2)(B)(i) provides in relevant part that "[w]hoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States . . . knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity," commits international money laundering.

14.    18 U.S.C. § 1956(h) provides that "[a]ny person who conspires to commit any offense of 1956 or 1957 is subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

## PROPERTY INFORMATION

15.    The "Defendant Property" comprises the following amounts of the virtual currency Tether ("USDT") held in the following virtual currency addresses (collectively, "Subject Addresses"):

a.    approximately 572,316.49 USDT ("Subject Currency 1"), valued at approximately $572,316.49 in U.S. dollars (USD), which is associated with virtual currency address 0xbf00c0b054c4083a2c704a7e2a20611855e50d02 ("Subject Address 1");

4

b.    approximately 452,185.00 USDT ("Subject Currency 2"), valued at approximately $452,185.00 USD, which is associated with virtual currency address 0x896def468062a99df96c50eceea601dd56bf74b7 ("Subject Address 2");

c.    approximately 340,205.00 USDT ("Subject Currency 3"), valued at approximately $340,205.00 USD, which is associated with virtual currency address 0x4621155a442bbaed90751676eb22b66420018e23 ("Subject Address 3");

d.    approximately 342,426.00 USDT ("Subject Currency 4"), valued at approximately $342,426.00 USD, which is associated with virtual currency address 0x295662443ab88c3089975a3be19ba19726274da9 ("Subject Address 4");

e.    approximately 300,000.00 USDT ("Subject Currency 5"), valued at approximately $300,000.00 USD, which is associated with virtual currency address 0xa055b6d9780d803b86bf54edf07aa7739cd7c04f ("Subject Address 5"); and

f.    approximately 382,646.28 USDT ("Subject Currency 6"), valued at approximately $382,646.28 USD, which is associated with virtual currency address 0x9ba3e88e1949f848de3b5b9046a5346fb5a55b46 ("Subject Address 6").

16.    The United States has yet to take custody and control over the Defendant Property, which is held, and was voluntarily frozen by, Tether.

## DEFINITIONS

17.    **Virtual Currency**: Virtual currencies are digital representations of value that, like traditional coin and paper currency, function as a medium of exchange (i.e., they can be digitally traded or transferred, and can be used for payment or investment purposes). Virtual currencies are a type of digital asset separate and distinct from digital representations of traditional currencies, securities, and other traditional financial assets. The exchange value of a particular virtual currency

generally is based on agreement or trust among its community of users. Some virtual currencies have equivalent values in real currency or can act as a substitute for real currency, while others are specific to particular virtual domains (e.g., online gaming communities) and generally cannot be exchanged for real currency. Cryptocurrencies, like Bitcoin and Ether, are types of virtual currencies, which rely on cryptography for security. Cryptocurrencies typically lack a central administrator to issue the currency and maintain payment ledgers. Instead, cryptocurrencies use algorithms, a distributed ledger known as a blockchain, and a network of peer-to-peer users to maintain an accurate system of payments and receipts.

18.     **Blockchain**: A blockchain is a digital ledger run by a decentralized network of computers referred to as "nodes." Each node runs software that maintains an immutable and historical record of every transaction utilizing that blockchain's technology. Many digital assets, including virtual currencies, publicly record all their transactions on a blockchain, including all of the known balances for each virtual currency address on the blockchain. Blockchains consist of blocks of cryptographically signed transactions, and blocks are added to the previous block after validation and after undergoing a consensus decision to expose and resist tampering or manipulation of the data. There are many different blockchains used by many different virtual currencies. For example, Bitcoin in its native state exists of the Bitcoin blockchain, while Ether (or "ETH") exists in its native state on the Ethereum network.

19.     **Blockchain Analysis**: Law enforcement can trace transactions on blockchains to determine which virtual currency addresses are sending and receiving particular virtual currency. This analysis can be invaluable to criminal investigations for many reasons, including that it may enable law enforcement to uncover transactions involving illicit funds and to identify the person(s) behind those transactions. To conduct blockchain analysis, law enforcement officers use reputable,

free open source blockchain explorers, as well as commercial tools and services. These commercial tools are offered by different blockchain-analysis companies. Through numerous unrelated investigations, law enforcement has found the information associated with these tools to be reliable.

20.    **Virtual Currency Address**: A virtual currency address is an alphanumeric string that designates the virtual location on a blockchain where virtual currency can be sent and received. A virtual currency address is associated with a virtual currency wallet.

21.    **Virtual Currency Exchange**: A virtual currency exchange ("VCE"), also called a virtual currency exchange, is a platform used to buy and sell virtual currencies. VCEs allow users to exchange their virtual currency for other virtual currencies or fiat currency, and vice versa. Many VCEs also store their customers' virtual currency addresses in hosted wallets. VCEs can be centralized (i.e., an entity or organization that facilitates virtual currency trading between parties on a large scale and often resembles traditional asset exchanges like the exchange of stocks) or decentralized (i.e., a peer-to-peer marketplace where transactions occur directly between parties).

22.    **Virtual Currency Wallet**: A virtual currency wallet (e.g., a hardware wallet, software wallet, or paper wallet) stores a user's public and private keys, allowing a user to send and receive virtual currency stored on the blockchain. Multiple virtual currency addresses can be controlled by one wallet.

23.    **Unhosted Wallet**: An unhosted wallet, also known as a self-hosted, non-custodial wallet, is a virtual currency wallet through which the user has complete control over storing and securing their private keys and virtual currency. Unhosted wallets do not require a third party's involvement (e.g., a virtual currency exchange) to facilitate a transaction involving the wallet. Unhosted wallets allow users to generate and manage their own unhosted wallet addresses.

24.     **Hosted Wallet**: A hosted wallet, also known as a custodial wallet, is a virtual currency wallet through which a third party, e.g., a virtual currency exchange, holds a user's private keys. The third party maintains the hosted wallet on its platform akin to how a bank maintains a bank account for a customer, allowing the customer to authorize virtual currency transactions involving the hosted wallet only by logging into/engaging with the third party's platform.

25.     **Decentralized Exchange**: A decentralized exchange (or "DEX") is a peer-to-peer marketplace where users can trade virtual currencies directly with other traders without centralized intermediaries. Users generally retain control over their virtual currency rather than entrusting a central authority to host funds in a centralized or "hosted" wallet. DEXs are operated by self-executing agreements written in code, known as "smart contracts," which automate the trading process. DEXs will algorithmically track the prices of various virtual currencies and often leverage locked reserves of virtual currencies (or other digital assets). These locked reserves are known as "liquidity pools," and they are often used to facilitate trades. DEXs are built on blockchains that support smart contracts, including Ethereum, and often levy fees for their services.

26.     **Transaction Fee**: A transaction fee is a fee paid by the party sending virtual currency on a blockchain to reward miners and/or validators for verifying and validating transactions. Transaction fees vary by blockchain and can fluctuate based on factors such as blockchain network traffic and transaction sizes. Senders of virtual currency can increase the transaction fees that they pay to have their transactions confirmed faster by miners and/or validators. Transaction fees are generally paid in a blockchain's native token (e.g., Bitcoin on the Bitcoin blockchain). On the Ethereum network, these transaction fees are called "gas fees." Gas fees are transaction costs paid in Ether ("ETH"), or its fraction, gwei. These fees serve as a form

of remuneration for validators who maintain and secure the network. Gas fees fluctuate based on supply, demand, and network capacity, and may increase during periods of network congestion.

27.    **Stablecoins**: Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency. For example, USDT is a stablecoin pegged to the U.S. dollar. Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

28.    **Tether**: Tether International S.A. de C.V. is a company that manages the smart contracts and the treasury (i.e., the funds held in reserve) for USDT tokens.

29.    **Ether**: Ether ("ETH") is a virtual currency that is the native token used by the Ethereum blockchain, which is a blockchain with smart contract functionality.

## STATEMENT OF FACTS

### Background on Cryptocurrency Investment Fraud

30.    USSS is investigating cryptocurrency investment fraud ("CIF") schemes, often referred to as "pig-butchering," a term derived from the Chinese-language word used to describe this scheme and its treatment of victims. In 2025 alone, more than 61,500 complaints of CIF were received by the FBI's Internet Crime Complaint Center (IC3), resulting in more than $7.2 billion in reported losses.[2] CIF schemes are often orchestrated by Asia-based criminal syndicates, predominately operating in southeast Asia.

31.    In CIF schemes, criminals contact potential victims through seemingly misdirected text messages, dating applications, or other online platforms/forums with the goal of building rapport and relationships with the victims.

---

[2] See Fed. Bureau of Investigation, Internet Crime Report 2025,
    https://www.ic3.gov/AnnualReport/Reports/2025_IC3Report.pdf.

32.     Once that trust is established, the criminal recommends virtual currency investment by touting their own, or an associate's success in the field. Investment methods vary, but a common tactic is to direct a victim to a fake investment platform hosted on a website. These websites, and the investment platforms hosted there, are created by criminals to mimic legitimate platforms. The subject usually instructs and/or assists the victim with opening an account on a centralized virtual currency exchange, such as Coinbase or Crypto.com, and then walks the victim through transferring money from a bank account to that virtual currency exchange account. Next, the victim will usually receive instructions on how to transfer their virtual currency assets to the fake investment platform. On its surface, the platform typically shows lucrative returns, encouraging further investment. However, in reality, all deposited funds are routed to a virtual currency address controlled by the criminals—the "butchering" phase of the scheme. A visual depiction of the general pig butchering scheme is shown below in Figure 1.

*Figure 1*



33.     In CIF schemes, the subjects will continue to encourage investments until victims have depleted their savings. Oftentimes, the subject will attempt to continue the scheme by

coaching victims on taking out loans against their homes or borrowing money from friends and family. Inevitably, these victims generally run out of money and make attempts to withdraw their funds. However, victims are unable to do so and are provided various excuses as to why. For example, subjects will often levy a fake "tax" requirement, stating taxes must be paid on the proceeds generated from the platform. This is just an eleventh-hour effort by subjects to elicit more money from victims; ultimately, victims are locked out of their accounts and lose all their funds. Even when victims procure enough funds to pay these "taxes," the subjects will continue to concoct new excuses and fees for victims to pay.

### Underlying CIF Scheme

34.     On or about March 26, 2025, Victim KB, a resident of Montgomery County, Maryland, reported to the Montgomery County Police Department that he had purchased millions of dollars' worth of cryptocurrency using his Coinbase.com account and transferred to a company using zoomex-net[.]com and www.zoomex-pay[.]com ("Zoomex"). KB believed Zoomex to be a legitimate investment company.

35.     In fact, zoomex-net[.]com and zoomex-pay[.]com were fictitious websites intended to mimic the legitimate cryptocurrency exchange company www.zoomex[.]com. As of March 30, 2026, the website zoomex-pay.com was found to be nonfunctional. The site zoomex-net.com is active and displays cryptocurrency-related promotional material.

36.     KB began using the purported Zoomex investment platform while in an online relationship with a woman he knew as Angelina Kovalonka ("Angelina"), with whom he communicated through the internet using the messaging application WhatsApp. [3]   Angelina

---

[3] WhatsApp is a communications platform with end-to-end encryption. In my training and experience, this encryption makes this platform a common means of communication in cryptocurrency scams.

claimed to have used financial advisor Ronald Hanson ("Hanson"), who was said to have made her a profit through cryptocurrency with Zoomex.

37.     Angelina referred KB to Hanson, who also communicated with KB through WhatsApp about investing (Figure 2).

*Figure 2*



38.     WhatsApp communications between KB, Angelina, and Hanson show a well-orchestrated scheme to manipulate and defraud KB.  The true identities of Angelina and Hanson (collectively, the "Subjects") are unknown.

39.     WhatsApp communications took place between November 4, 2024, and April 22, 2025, and show that Hanson presented himself as a trading expert. Over the course of several months, communication centered on cryptocurrency trading, with Hanson acting as the group's

12

guide. He routinely sent supposed trading "signals" and repeatedly pressured KB to commit increasingly large amounts of capital and to transfer funds quickly (Figure 3).

### Figure 3

```
[11/14/24, 10:08:08 PM] Ronald: If you're able to reach a balance of $500,000
to $800,000 in your trading wallet by next week, I can help you target a
potential return of $1.5 million to $2 million by month's end. My investors
have seen returns of over $12 million in just 10 days by acting strategically. A
savvy investor never misses the chance to capitalize on such opportunities.
```

40.     As depicted in WhatsApp messages, Angelina claimed to follow Hanson's guidance and execute substantial trades that generated significant profits. Hanson and Angelina led KB to believe that the funds he contributed were secure and rapidly increasing in value.

41.     At the direction of the Subjects, KB utilized his personal cryptocurrency account on Coinbase[4] to convert both his personal savings and additional funds he received via electronic wire from his friend, RC, into cryptocurrency. KB and RC then used the cryptocurrency for the purpose of investing the currencies through "Zoomex" by sending the funds to wallet addresses provided by the Subjects.

42.     After KB purchased cryptocurrency for himself and RC, KB transferred the assets to wallet addresses he believed were associated with Zoomex or to RC's Coinbase account so that RC could transfer funds to the Zoomex investment wallet.

43.     The Subjects led KB and RC to believe the funds they were providing Zoomex were being invested and that they were making sizable profits.

44.     Eventually, KB and RC attempted to withdraw their invested cryptocurrency from Zoomex but were unsuccessful due to their Zoomex accounts being "locked." To unlock the account, they were encouraged to pay "miners' fees" to access their investment (Figures 4–5):

---

[4] Platform for buying, selling, transferring, and storing cryptocurrency.

*Figure 4*

[4/14/25, 8:36:42 PM] Ronald: Definitely, this will be counted toward your profit, and none of this profit will be affected by the miner fees, Mr. ███. Once your account is unlocked, all your funds will be easily accessible without any issues.

Please don't worry everything is secure, and your patience will be rewarded. I'm here to assist you every step of the way, and I truly appreciate your trust throughout this process.

*Figure 5*



45.     After being unable to access their funds, KB and RC came to suspect that the investment company Zoomex was fraudulent and that their cryptocurrency had been stolen.

**Summary of Money Laundering Activity**

46.     From or about November 18, 2024, through March 25, 2025, KB and RC sent approximately 2126 ETH, which had a value of approximately $5,251,461, from their Coinbase wallets to Subject-controlled addresses 0x37fe0abff938c6588f3a93f77dd5bd52dcbb186d ("186d") and 0x14e6c6d002d5a0d16c22aee9ea6052649bad22c0 ("22c0") as instructed by the Subjects. These transfers are summarized below:

| Suspect Address | Amount in ETH | Transactions |
|---|---|---|
| Ethereum Network | | |
| 0x37fe0abff938c6588f3a93f77dd5bd52dcbb186d | 2,117.99 | 21 |
| 0x14e6c6d002d5a0d16c22aee9ea6052649bad22c0 | 8.00 | 1 |
| **Total** | **2,125.99** | **22** |

47. The Defendant Property is traceable to six of those summarized transactions.

48. Once the funds were under the Subjects' control, the ETH was moved through numerous wallets to obfuscate the source of the funds. These transactions would have incurred unnecessary fees and had no purpose other than to obfuscate the path of the cryptocurrency.

49. The ETH was eventually swapped for USDT before being sent to un-hosted cryptocurrency addresses ("Subject Addresses"). A summary of this flow is shown in Figure 6.

*Figure 6*

50. After the funds were converted to USDT, law enforcement contacted Tether, and Tether voluntarily blocklisted the Subject Addresses.

51. The Defendant Property is summarized below and comprises the entirety of the funds in the Subject Addresses:

| Property | Wallet Address | USDT |
|---|---|---|
| Subject Currency 1 | 0x9ba3e88e1949f848de3b5b9046a5346fb5a55b46 | 382,646.30 |
| Subject Currency 2 | 0xa055b6d9780d803b86bf54edf07aa7739cd7c04f | 299,990.00 |
| Subject Currency 3 | 0x4621155a442bbaed90751676eb22b66420018e23 | 340,205.00 |
| Subject Currency 4 | 0x295662443ab88c3089975a3be19ba19726274da9 | 342,426.20 |
| Subject Currency 5 | 0xbf00c0b054c4083a2c704a7e2a20611855e50d02 | 341,780.00 |
| Subject Currency 6 | 0x896def468062a99df96c50eceea601dd56bf74b7 | 452,185.00 |

***Detailed Tracing Proceeds of the CIF Scheme to the Defendant Property***

52.     In March 2025, Subject-controlled address 186d received six deposits of ETH from KB and RC. The ETH, which constituted fraud proceeds, was transferred through multiple intermediaries, and finally to the Subject Addresses.[5] The initial deposits are summarized below:

| Transaction Hash | ETH Value | USD Value | Date |
|---|---|---|---|
| 0xc5d622dbae63322d2bb5f04b5fbd3d3311b42f47a05bf0175026df411951d1fe | 280.34839 | 566,504.26 | 3/10/2025 |
| 0x067018f3f198c810323dda4799c46ab57432c3f9a06c70d2885a71c909634328 | 256.0125 | 517,328.367 | 3/10/2025 |
| 0xb40bf7c7e2f77dbfefcac959e0112916a467afe9ab2a66b617214b7a86ee9583 | 417.59996 | 867,962.337 | 3/24/2025 |
| 0x0bd5945342184e0bb62e331a265ed0b8eb98c95260f827bf42e341d1eb7e00dd | 2.3988257 | 4,985.84907 | 3/24/2025 |
| 0x1bf32f200262cec06820a057d95c831e4275d5965c79341d5cba92a391e7f4b0 | 48.274081 | 100,277.001 | 3/25/2025 |
| 0x4b0ce2592d74aa386f99fc60bc90bb0602f5ab28b8c3115e95c82992db973c5d | 54.101336 | 112,381.626 | 3/25/2025 |

53.     On or about March 10, 2025, Subject-controlled address 186d had an existing balance of 0 ETH. 186d received deposits of approximately 280.34 ETH and 256.01 ETH[6], both of which were sent from KB's Coinbase wallet. Following those two deposits, the entire balance of 186d, totaling approximately 536.36 ETH, was immediately withdrawn in two transactions to address 0x93eaea375a7192a028c07c8a88676 f0c1066f380 ("f380"),[7] which had a prior balance of approximately 0.47 ETH. The balance of approximately 536.8 ETH, approximately 99.9% of

---

[5] All funds were traced using the Last in First Out ("LIFO") method.
[6] Transaction hashes 0xc5d622dbae63322d2bb5f04b5fbd3d3311b42f47a05bf0175026df411951d1fe and 0x067018f3f198c810323dda4799c46ab57432c3f9a06c70d2885a71c909634328
[7] Transaction hashes 0xd1d489d71663b530460236a497724bc724bc7a4b3d2578cff9f820390e429c72 and 0x518bfd3b8f9b35ed61df6bd686fff8d11f631f6de64ae4a2bfdc86919bc0279a.

which constituted known fraud proceeds, was then immediately transferred to 0x4c248143cc00a19a204 716576cc2b4b9823ee7be ("e7be").[8] This flow is shown in Figure 7 in green.

54.    On or about March 24, 2025, 186d had an existing balance of 0 ETH. 186d received deposits of approximately 417.59 ETH and 2.39 ETH into 186d.[9] Following those two deposits, the entire balance of 186d, totaling approximately 420.00 ETH, was immediately withdrawn in one transaction to f380, which had a prior balance of approximately 0.13 ETH.[10] Approximately 420.00 ETH constituting fraud proceeds was then immediately transferred to e7be.[11] This flow is shown in Figure 7 in orange.

55.    On or about March 25, 2025, 186d had an existing balance of 0 ETH. 186d received deposits of approximately 48.27 ETH and 54.10 ETH into 186d.[12] Following those two deposits, the entire balance of 186d, totaling approximately 102.37 ETH, was immediately withdrawn in one transaction to f380, which had a prior balance of approximately 0.13 ETH.[13] Approximately 102.00 ETH constituting fraud proceeds was then immediately transferred to e7be.[14] This flow is shown in Figure 7 in purple.

---

[8] Transaction hash 0x6691a8018ff6bdf16ed6f41df9e10c125379c9329b81aacc9bfdc59a90483414.
[9] Transaction hashes 0xb40bf7c7e2f77dbfefcac959e0112916a467afe9ab2a66b617214b7a86ee9583 and 0x0bd5945342184e0bb62e331a265ed0b8eb98c95260f827bf42e341d1eb7e00dd.
[10] Transaction hash 0x254c16982e23305aeedc8c301f0f6876b610f137062650078d25dabf0cb0ded0.
[11] Transaction hash 0x8b1992772d1771cd1a7f8551dbb6b5b3437480d75f69fe2da1b0ee77cb406542.
[12] Transaction hashes 0x1bf32f200262cec06820a057d95c831e4275d5965c79341d5cba92a391e7f4b0 and 0x4b0ce2592d74aa386f99fc60bc90bb0602f5ab28b8c3115e95c82992db973c5d.
[13] Transaction hash 0x254c16982e23305aeedc8c301f0f6876b610f137062650078d25dabf0cb0ded0.
[14] Transaction hash 0x8b1992772d1771cd1a7f8551dbb6b5b3437480d75f69fe2da1b0ee77cb406542.

17

*Figure 7*



56.     From on or about March 10, 2025, through March 25, 2025, the fraud proceeds deposited in from e7be were split into three addresses. On March 10, 2025, following the deposit of approximately 536.8 ETH in fraud proceeds, e7be funded a transfer of approximately 330 ETH to 0x9f848d1b771aa369fa047db 4e35ce4fbe6b1a4b0 ("a4b0"). On March 24, 2025, following the deposit of approximately 420 ETH in fraud process, e7be funded a transfer of approximately 420 ETH to 0x477077e614dd8bb749a2cbfa670acddce7708b96 ("8b96"). On March 25, 2025, following the deposit of approximately 102 ETH in fraud proceeds, e7be funded a transfer of approximately 102.31 ETH to 0x6c22d9d49ae80e293203e363d54ea505798f4cbf ("4cbf").

57.     The following transactions occurred on or about May 27, 2025:

a.      a4b0 initiated a transfer of approximately 330.497 ETH, approximately 99% of which was traceable to victims, to 0x077a003f0949d809a6c3ab94cc1696463f35c165 ("c165").[15] (Figure 8.)

b.      4cbf initiated a transfer of approximately 102.372 ETH, approximately 99% of which was traceable to victims, to 0xa63d2a532ca58bee0bb09f12c8fb2b77a2df09a2 ("09a2").[16] (Figure 8.)

---

[15] Transaction hash 0x82dbdb0e7171ad592f68eb68b209415a02a6a0ea9820721b3e6557b1a8511cb5.
[16] Transaction hash 0xd1d5dbd8ff577a35d768fcb70a062a74e30711a31220ed9443474f8d0096ea39.

c.    8b96 initiated two transfers totaling approximately 419.5 ETH, approximately 99% of which was traceable to victims, to 0xb1555cc16c901d15ff568f36c3 ddd3761fab6ade ("6ade")[17] and 0x8d298f7c114deb1972d5e0aebb82600b2418d88f ("d88f").[18] (Figure 9.)

58.    On or about July 17, 2025, 6ade,[19] d88f,[20] 09a2,[21] and c165[22] each initiated one transaction with virtual currency exchange (VCE) Tokenlon. As part of the transaction, the Subject-controlled addresses sent their then-balances of ETH to Tokenlon, and the Tokenlon Output Wallet sent the then-current USD equivalent of USDT to the respective Subject-controlled addresses, less a service fee.

59.    Currency swaps can be identified using the transaction hashes associated with each Tokenlon transaction.  The hashes for each of the foregoing transactions are identical, indicating they are linked to the same swap event. The outgoing ETH transfers reflect USD values that match the equivalent USDT amounts at the time, minus a small service fee. The outgoing ETH transactions and corresponding incoming USDT transactions occurred simultaneously. Additionally, the sending and receiving addresses involved are attributed in the blockchain as Tokenlon, a well-established cryptocurrency swap service.

60.    The following virtual transactions occurred on or about July 17, 2025:

a.    09a2 transferred approximately 341,780.00 USDT, approximately 99% of which constituted known victim funds, to Subject Address 1 (Figure 8).[23]

---

[17] Transaction hash 0x06fec9a645458393d6d6624e91fb39cb60aaa1b12217d89c597242b2e9a1bd42.
[18] Transaction hash 0x85a502be32bfeb26359c6062353dc75a6761e1a91f5fe832d86fa381fae10720.
[19] Transaction hash 0xf6175c1a9a11ac7814f3e94f42e07a450cd119ff0c3fbcf0c46e07f4c71c23a3.
[20] Transaction hash 0x204caf8e2154a7d5e82f3915c66f54b32d1461aa0f530f518770e5b46b347935.
[21] Transaction hash 0xd46ae1bc50892edbd9ea7bb2a614f85a2c9fd928a805515e86b02752bcb9e1b4.
[22] Transaction hash 0xe74f98573c2fbe808e5c31b028b46059f32a3cc977bb78440793d2f88790b501.
[23] Transaction hash 0x11bcd3644f64d149ae5f6e19c5181874acace4de9f82440bf301aec57a25ecc9.

b.      c165 transferred approximately 230,536.49 USDT, approximately 99% of which constituted known victim funds, to Subject Address 1 (Figure 8).[24]

c.      c165 transferred approximately 452,185 USDT, approximately 99% of which constituted known victim funds, to Subject Address 2 (Figure 8).[25]

d.      6ade transferred approximately 340,205 USDT, approximately 99% of which constituted known victim funds, to Subject Address 3 (Figure 9).[26]

e.      6ade transferred approximately 342,426.19 USDT, approximately 99% of which constituted known victim funds, to Subject Address 4 (Figure 9).[27]

f.      d88f transferred approximately 299,990 USDT, approximately 99% of which constituted known victim funds, to Subject Address 5 (Figure 9).[28]

g.      d88f transferred approximately 382,646.28 USDT, approximately 99% of which constituted known victim funds, to Subject Address 6 (Figure 9).[29]

*Figure 8*

---

[24] Transaction hash 0x0868910f642dccb7da7270f7e7d061da05c98adb279611ccab769f08b0406be4.
[25] Transaction hash 0xc8dd29e2e3ad295b30486ac084d73dabb32845087d1a3789b06133a5b46ed60d.
[26] Transaction hash 0x158c4992e0f46b87b0f706556658c33535412d4ceb574d7b11042fd9069e7c61.
[27] Transaction hash 0xbe58a2dd348075d35f09a2d556786f043cc0a38258ff36d80cb19a967f56abc3.
[28] Transaction hash 0x0c3ea13221aa0e69bc02d8f03f315ef58dd532b956dda25579f1d73b40247694.
[29] Transaction hash 0xde7f15e53623b907ec482f68c74e4f1eb5fcf7205dacfde303d7f3543777acaa.

*Figure 9*



61.     On or about July 17, 2025, USSS contacted Tether regarding the foregoing transfers. On or about July 18, 2025, Tether informed USSS that Tether had voluntarily frozen the Subject Addresses.

62.     Approximately 2,389,779.06 USDT, which comprises the Defendant Property, remains in the Subject Addresses. More than 99% of the Defendant Property is traceable to victims **KB** and **RC**.

63.     The above flow of funds is indicative of money laundering. At each stage above, various methods were used by criminals to thwart law enforcement's ability to trace, and ultimately recover, any illicit proceedings. Those methods include:

        a.     *The Use of Unattributable "0 Level" Deposit Addresses (186d, Figure 7).* 0 Level addresses are the initial deposit addresses in which victims deposit funds on the blockchain. These addresses are provided to victims by the criminals. Because of this, criminals usually provide unhosted wallets as 0 Level addresses to evade identification or potential

21

interference. Such is the case here with 186d. Additionally, these 0 Level addresses are oftentimes only shared with one victim to reduce the likelihood that their address is flagged to law enforcement.

b.    *High Velocity Flow of Funds (numerous addresses, Figure 7).* Once deposited into the 0 Level Address, it is common for the funds to flow quickly from address to address before reaching a consolidation wallet, where the funds might rest for a longer period, allowing criminals time to comingle those funds with other illicit gains before moving the funds again towards a cash-out point where they can convert the pool of funds to fiat currency. KB's and RC's funds reflect this method on numerous occasions by being transferred into, and out of, an address within hours or even minutes.

c.    *Use of Decentralized Exchanges (Tokenlon).*    DEXs allow users to swap one cryptocurrency type for another, often without having to provide any identifying information (i.e., know your customer ("KYC") data), so users can remain anonymous. The victims' funds were swapped from ETH to USDT using Tokenlon, a DEX.

d.    *Swapping for Stablecoins, Especially USDT (Figures 8 and 9).* CIF scammers involved in laundering victims' funds regularly exchange or "swap" the non-stablecoin cryptocurrencies that victims send them for stablecoins, especially USDT. According to investigators, money launderers are particularly drawn to USDT because of its low transactions fees and stability compared to other more volatile cryptocurrencies. Additionally, USDT is compatible on several different blockchains, which makes it easier to move funds across blockchains to further obfuscate the nature, source, control, and/or ownership of criminal proceeds.

64.    There is no reason, economic or otherwise, for legitimate businesses or individuals to conduct cryptocurrency transfers in the above fashion. Whether transferring ETH or USDT,

each individual virtual currency transfer costs money. For USDT on the Ethereum blockhcain, that cost comes through the payment of transactions fees, or "gas" fees, required by the Ethereum blockchain. It is reasonable to assume that businesses and individuals would strive to minimize those fees by conducting transfers with as few transactions, or "hops," as possible. Furthermore, each transaction delays the whole process, defeating one of the key attributes of virtual currency as a quick means of exchange.

**Potential Third-Party Claimant**

65.    On or about September 1, 2025, Tether.io notified investigators that "Zhouzhouzhu" with email address zhouzhouzhu888@gmail.com had contacted them claiming ownership of the Subject Addresses. On or about September 2, 2025, USSS received an email directly from zhouzhouzhu888@gmail.com asking why the addresses were frozen and how to unfreeze them. On or about September 11, 2025, USSS replied to zhouzhouzhu888@gmail.com and asked for the potential claimant's name, address, passport number, and the source of the funds. The same day, using zhouzhouzhu888@gmail.com, the potential claimant responded with a list of involved cryptocurrency wallets and the name Ververis Alexander Kevin, a passport number, and an address located in China.

66.    The email address zhouzhouzhu888@gmail.com is associated with the name Zhou Zhihua. The associated phone number and internet protocol ("IP") addresses are linked to Malaysia, which is not consistent with the address provided by the individual.

67.    As of July 2026, the investigators have not received legitimate proof of ownership of the funds from the individual.

## COUNT ONE – FORFEITURE OF DEFENDANT PROPERTY

## (18 U.S.C. § 981(a)(1)(C))

68.    The Defendant Property includes property constituting or derived from proceeds traceable to wire fraud and conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1343 and 1349.

69.    Accordingly, the Defendant Property is subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(C).

## COUNT TWO – FORFEITURE OF DEFENDANT PROPERTY

## (18 U.S.C. § 981(a)(1)(A))

70.    The Defendant Property constitutes property involved, or traceable to property involved in, (a) domestic and international concealment of money laundering transactions committed in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1956(a)(2)(B)(i); and (b) a conspiracy to engage in money laundering, committed in violation of 18 U.S.C. § 1956(h).

71.    Accordingly, the Defendant Property is subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(A).

**PRAYER FOR RELIEF**

WHEREFORE, the United States of America prays that notice issue on the Defendant Property as described above; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that this Honorable Court issue a warrant of arrest *in rem* according to law; that judgment be entered declaring that the Defendant Property be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other relief as this Court may deem just and proper.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney


*/s/ Rick Blaylock, Jr.*
RICK BLAYLOCK, JR.
TX Bar No. 24103294
Assistant United States Attorney
United States Attorney's Office
District of Columbia
601 D Street, N.W.
Washington, D.C. 20001
(202) 252-6765
rick.blaylock.jr@usdoj.gov

JEHIEL I. BAER
WSBA No. 46951
Assistant United States Attorney
United States Attorney's Office
Western District of Washington
700 Stewart Street, Suite 5220
Seattle, Washington 98101
(206) 553-4169
Jehiel.baer@usdoj.gov

## VERIFICATION

I, Michael Adami, a Task Force Officer with the United States Department of Homeland Security, United States Secret Service, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture *in rem* is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct.

Executed on this  _21st_  day of July, 2026.


_____
MICHAEL ADAMI
Task Force Officer
United States Secret Service

26